UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION LEXINGTON

GE'LAWN RAKEEM GUYN,  )
    Plaintiff,  )
    )   Civil No. 5:22-CV-332-KKC-MAS
V.  )
    )
    )
WALMART STORES EAST, LIMITED  )   **OPINION AND ORDER**
PARTNERSHIP, et al.,  )
    Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*

This matter is before the Court on the motions for summary judgment filed by all three defendants (R. 60, 61, 62). For the following reasons, the Court will grant the motions.

**I.    Background**

Defendants are entitled to summary judgment if, under the undisputed facts and the plaintiff's version of any material disputed facts, defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Davenport v. Causey*, 521 F.3d 544, 546 (6th Cir. 2008); *Rimco, Inc. v. Dual-Tech, Inc.*, No. 3:21-CV-313, 2022 WL 4545608, at \*1, n.1 (E.D. Tenn. Sept. 28, 2022) ("As required, this Court accepts undisputed facts as true. In deciding a motion for summary judgment as to which the parties dispute any material facts, the Court must view the disputed evidence in the light most favorable to the party responding to the motion—here, Plaintiff—and draw all reasonable inferences in that party's favor.")

Accordingly, for purposes of these motions, the Court has considered the material facts that the parties agree to and has considered the plaintiff's version of any material facts that the parties dispute.

Plaintiff Ge'Lawn Rakeem Guyn worked for a retail store owned by defendant Walmart Stores East, Limited Partnership located in Georgetown, Kentucky. (R. 60-1 Walmart Record.) He worked as a stocker in the grocery department on the third shift (10:00 p.m. to 6:00 a.m.). (R. 1 Complaint ¶ 11.) Guyn asserts that he began working there on September 11, 2021 as a temporary employee and he was initially paid by the temporary agency that placed him there. (R. 60-4 Guyn Note.) Walmart has submitted evidence that it hired Guyn on October 7, 2021, and he was terminated on January 1, 2022. (R. 60-1 Walmart Record.)

Guyn is an African American male and is also Muslim. His direct supervisors at Walmart were defendants Phillip Spitznagel and Kenneth Newsome. Spitznagel was not transferred to Guyn's shift until November 6, 2021. (R. 60 Walmart Mem. 4; R. 60-5 Record.) Guyn alleges that Spitznagel and Newsome discriminated against him during his employment because of his race and religion by, for example, making discriminatory comments and jokes and by monitoring him more closely than other employees.

He testified that Newsome told him he had to stock a certain aisle because it contained a large quantity of bacon and that Guyn would have to do so by himself because he was black. (DE 69-1 Guyn Dep. 59.) He also testified that Newsome told him multiple times that, "if it was back in the day, we would take you for a ride . . . for not cooperating and doing as you're told." (DE 69-1 Guyn Dep. 63.) Guyn testified that, after Spitznagle was assigned the same shift as Guyn, he "joined in" with Newsome. (DE 69-1 Guyn Dep. 59.)

Guyn testified that Newsome terminated him after he complained to store manager Joey Allen. He then filed this action naming Walmart, Spitznagel, and Newsome as defendants. He asserts that they retaliated against him for complaining about racial discrimination and that such

retaliation violated 42 U.S.C. § 1981. He also asserts a retaliation claim under the Kentucky Civil Rights Act against Walmart only.

All three defendants move for summary judgment in their favor.

**II.    Analysis**

Section 1981 provides that all persons have the right to "the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "To prevail on a section 1981 claim, a litigant must prove intentional discrimination on the basis of race, which involves a high threshold of proof." *Chapman v. Higbee Co.*, 319 F.3d 825, 832–33 (6th Cir.2003). Other types of discrimination, such as discrimination on the basis of religious affiliation, are not actionable under the statute. *Saint Francis Coll. v. Al–Khazraji*, 481 U.S. 604, 613 (1987); *Runyon v. McCrary*, 427 U.S. 160, 167 (1976).

Section 1981 also prohibits an employer from retaliating against an employee for opposing racial discrimination. *Herrera v. Churchill McGee, LLC*, 545 F. App'x 499, 500–01 (6th Cir. 2013) (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 454–55 (2008)). To establish a prima facie case of retaliation, a plaintiff must present evidence that (1) he engaged in protected activity, (2) the activity was known to the defendant, (3) the plaintiff was subjected to a materially adverse action, and (4) there was a causal connection between the protected activity and the adverse action. *Harris v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 594 F.3d 476, 485 (6th Cir. 2010). Upon this showing, the defendant must articulate a legitimate, nonretaliatory reason for its action. *Id*. If the defendant does so, the plaintiff then must show that the proffered reason was a pretext for retaliation. *Id*.

As both parties agree, the Court must analyze the KCRA retaliation claim under the same burden-shifting framework applicable to § 1981 retaliation claims. *See Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 514 (6th Cir. 2022).

### A. Prima Facie Case

"The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met." *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (citation omitted).

As to evidence that Guyn engaged in "protected activity," he testified that he verbally complained to store manager Joey Allen at least twice about Spitznagel and Newsome. He is not certain when those conversations occurred but thinks they occurred before Black Friday in November 2021. (DE 69-1 Guyn Dep. 93, 97.) He testified that he told Allen how "they were harassing me, saying black jokes, discriminatory jokes, comments." (DE 69-1 Guyn Dep. 94; *see also* 100-01, 177.) He also testified that he told Allen that Spitznagel and Newsome, who assigned staff to stock each aisle, did not staff anyone to help Guyn stock the two aisles he was assigned. (DE 69-1 Guyn Dep. 94-95.) He testified that he told Allen that all other employees had assistance stocking their aisles and the reason he was being treated differently was because he was black. (DE 69-1 Guyn Dep. 94-95.) He testified that he also told Allen about the "racial jokes" by Newsome. (DE 69-1 Guyn Dep. 178.)

Further, in its response to Plaintiff's request for admissions, Walmart admits that "Plaintiff verbally complained to Store Manager Joey Allen of alleged harassment and/or discrimination at Walmart Store #571 on one or more occasions during his employment at Walmart, though the specific dates of the alleged verbal complaints are presently unknown." (R. 69-3 Admissions.) Walmart made similar admissions in its answer to the complaint. (R. 13 Answer ¶¶ 17, 23, 26.) In these admissions, Walmart did not identify what kind of discrimination Guyn complained of but,

4

given that this is a § 1981 action, it could be inferred that Walmart would have clarified in its admissions that Guyn's complaints of discrimination did not include racial discrimination if that were the case.

Finally, in a December 7, 2021 report, Allen stated, "I have an overnight associate Gelawn Guyn, he is claiming *racial discrimination*, sexual comments and aggression against the overnight coach Phillip Spitznagel." (R. 65 Ethics Case Management Details; R. 69-2 Allen Dep. 118) (emphasis added). The defendants point out that Guyn's complaint that prompted this report did not mention racial discrimination. Instead, Guyn complained that, on November 26, 2021, Spitznagel "forcefully smack[ed]" him on the shoulder and told Guyn to come to his office. Guyn stated he refused and told Spitznagle, that, if he ever hit Guyn again, Guyn would "return the hit." He also stated that Spitznagel had "repeatedly made sexual gestures and comments that are very uncomfortable." (R. 60-6.)

Nevertheless, Allen's report specifically stated that Guyn had complained of racial discrimination. This is sufficient evidence from which a juror could infer that, prior to his termination, Guyn complained of racial discrimination in the workplace.

As to Walmart's knowledge of the complaint, Allen reported Guyn's complaints, including his complaints of racial discrimination, through Walmart's Ethics Case Management Service. (R. 65 Ethics Case Management Report.) This is sufficient evidence that Walmart was aware of Guyn's complaint of racial discrimination. As to Newsome and Spitznagle, they both denied that Allen told them about any racial discrimination complaints by Guyn. However, in his December 7, 2021 report, in which Allen asserts that Guyn was "claiming racial discrimination," Allen also stated he had taken statements from Spitznagel and Newsome. A juror could infer from this that Allen told Newsome and Spitznagle about racial discrimination complaints.

As to whether Guyn suffered an adverse employment action, being fired qualifies. *Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605 (6th Cir. 2020). Guyn also asserts after his complaints of discrimination, the jokes and harassment by Spitznagle and Newsome increased. (DE 69-1 Guyn Dep. 97.) While disturbing if true, these actions do not qualify as adverse employment actions. Adverse employment actions are typically marked by a "significant change in employment status, including hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 620 (6th Cir. 2020) (internal quotations and citation omitted). Guyn has not alleged that any actions by the defendants caused a significant change in his employment status other than his termination.

There is no evidence, however, that Spitznagle had any role in Guyn's termination. Accordingly, the Court must enter judgment in his favor on the § 1981 claim against him.

As to the causal connection between the complaint and termination, "Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity alone may satisfy the causal prong of a plaintiff's prima facie retaliation case." *Herrera*, LLC, 545 F. App'x at 501 (internal quotations and citation omitted). In *Herrera*, the plaintiff last complained of discrimination in February 2008 and was fired on March 22, 2008. The court determined this "a sufficiently close temporal proximity to allow us to make an inference of causation." *Id*. at 502. In support of that finding, the court cited other Sixth Circuit cases holding that a time period as long as three months between the complaint and adverse employment action was sufficiently close in time to permit an inference of causation.

Here, there is no evidence as to the precise date when Guyn first complained to Allen of racial discrimination. However, Allen filed the report on December 7, 2021 stating that Guyn had

6

complained of racial discrimination and that Allen had taken a statement from Newsome. Guyn was fired less than a month later. The time period between the two events is sufficiently short that a jury could infer that the first event caused the second.

Citing *Montell v. Diversified Clinical Servs., Inc.*, 757 F.3d 497 (6th Cir. 2014), Newsome argues that "temporal proximity, standing alone, is not sufficient evidence to meet the causation requirement." (R. 73 Reply 9.) In that case, however, the Sixth Circuit explicitly stated, "we have held that temporal proximity alone can be enough." *Id*. at 505. There, the court explained that, where an employer previously contemplated an adverse action like termination before the employee makes a discrimination complaint, then courts must "analyze the evidence of how and when the adverse employment action occurred to determine whether it squares with the action previously contemplated. If it does, then temporal proximity is not evidence of causality, but if the adverse employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation." *Id*. at 507. While there is ample evidence as described below that, in his short tenure at Walmart, Guyn's supervisors had multiple issues with his work performance and attitude, neither Walmart nor Newsome cite any evidence that they contemplated firing him until Newsome did so on January 1, 2022.

Accordingly, Guyn has presented sufficient evidence to establish a prima facie case of retaliation against Walmart and Newsome. He has not, however, established a prima facie case of retaliation against Spitznagle.

### B. Legitimate Nondiscriminatory Reason

Walmart and Newsome argue that it had a legitimate nondiscriminatory reason for firing Guyn: his poor work performance and attitude at work. They cite the following evidence:

- October 26, 2021 – Travis Hawk, Guyn's initial supervisor, recorded in a disciplinary action that he told Guyn what the expected stocking times for his aisle were. Hawk stated that Guyn argued with and ignored him when Hawk tried to give him direction (R. 60-2; R. 61-3.)

- November 26, 2021 – Spitznagel approached Guyn to tell him he was taking too long to stock shelves. (R. 60-17 Spitznagel Dep. 43-44.) He found Guyn on his cell phone while working in violation of Walmart policy. Guyn "proceeded to berate" Spitznagel and yell at him when Spitznagle directed Guyn to come to his office. (R. 60-17 Spitznagel Dep. 45-46.) Employee Eva Mullins, who witnessed the event, stated in a December 1, 2021 note to Allen that Guyn refused to go to the office with Spitznagel despite Spitznagel's repeated requests that he do so. (R. 60-9 Mullins' Statement.)

- December 6, 2021 – Spitznagel recorded in a disciplinary action that Guyn's performance in recent weeks had "gone down" and that his "attitude towards work has done major impacts to the team production time and has rubbed off on others." Spitznagel stated that Guyn left work on December 5 at 7:00 a.m. without straightening the aisles or contacting Newsome or Spitznagel. (R. 60-3; 61-7.)

- December 21, 2021 – Newsome completed a statement asserting that Guyn checked in for work at 10:06 p.m. but Newsome did not see him in his aisle until 11:00 p.m. When Newsome asked Guyn where he had been, he responded that he was in the restroom and that, "if we wanted to go in and smell his 'shit' we could." (R. 60-12 Statement.)

8

- Newsome testified that he brought Guyn into his office multiple times to talk about his job performance, specifically his "not getting the aisles done . . . in the way they needed to be done" and not "straightening up" the aisles. He testified that another issue was Guyn's "poor attitude." (R. 60-16 Dep. 44.)

- Store manager Joey Allen testified that he received complaints of Guyn taking "excessive breaks" and that Guyn would work out on an ab rolling machine in the store when he was supposed to be stocking his aisle. (R. 60-14 Dep. 132.)

- January 1, 2022 – Newsome called Guyn into his office to talk with him about his job performance. Newsome testified that Guyn "should have had the aisle done and he didn't. . . I don't even believe it was halfway done." Guyn refused to talk to Newsome, who terminated Guyn that night. (DE 60-16 Newsome Dep. 47-48.)

This is sufficient evidence of a legitimate nondiscriminatory reason for Guyn's termination.

### C. Evidence of Pretext

Thus, to defeat summary judgment, Guyn must point to evidence that Walmart did not really fire Guyn for poor work performance and attitude but, instead, because he complained of racial discrimination. On summary judgment, he need only produce enough evidence to rebut the defendant's proffered reason for his termination. *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012). To do this, he must point to evidence "that his employer's proffered reason was false and that retaliation was the real reason for the adverse action." *Herrera*, 545 F. App'x at 503. "A plaintiff may prove a reason false by showing that it (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) was insufficient to motivate the employer's action." *Id*.

"The first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are 'factually false.'" *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).

"The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Id*.

"The second showing, however, is of an entirely different ilk." *Id*.

> There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of [retaliation] makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

*Id*. For this type of rebuttal, "the plaintiff may not rely simply upon his prima facie evidence but must, instead, introduce additional evidence" of retaliation. *Id*

In his response, Guyn points to four kinds of evidence he relies on to prove pretext.

First, Guyn points to Newsome's testimony that, the night he terminated Guyn, he told Guyn, "If you can't respond to what I'm saying to you, then you're terminated tonight." (DE 69-4 Newsome Dep. 42.) Here, Guyn seems to argue that Newsome's testimony indicates that his work performance and attitude did not actually motivate Newsome to fire him. Instead, it indicates that Newsome fired him because Guyn would not talk to him. Even if this were evidence that

10

Newsome fired Guyn for not talking to him, it is not evidence that Newsome fired him in retaliation for complaints of racial discrimination.

More importantly, however, Newsome made this statement to Guyn only after telling him, "We've had a lot of conversations about your performance. . . as far as stocking speed, getting the . . . aisle done . . . with no improvements." (DE 69-4 Newsome Dep. 41.) He also told Guyn, "You've had a very poor attitude with everything going on when I've approached you . . . and talked to you about it." (DE 69-4 Newsome Dep. 41-42.) It was only after explaining this to Guyn that Newsome told him if he would not respond to him regarding the issues with his job performance, then he was terminated. A juror could not infer from this testimony that Guyn's work performance did not actually motivate Newsome to fire Guyn.

The second kind of evidence that Guyn relies on to prove pretext is that Walmart has not produced emails between Allen, Newsome, and Spitznagel documenting any issues with his work performance and attitude. With this argument, Guyn appears to contest whether any of the instances of poor work performance and attitude that Walmart relies on occurred. The Court has outlined above, however, the evidence that Walmart has produced documenting that Guyn's supervisors had issues with his work performance and attitude. While this evidence may not consist of emails, it is nonetheless evidence that Guyn's supervisors had issues with his work performance and attitude and that they discussed those issues with Guyn on multiple occasions.

The third kind of evidence Guyn relies on to prove pretext is what he argues was a failure by Allen and Walmart to investigate his complaints of racial discrimination. The records show, however, that Allen did conduct an investigation of Guyn's only written complaint in the record, which was the December 1, 2021 statement. In his December 7, 2021 report, Allen explained:

> I have collected statements from Gelawn, Phillip Spitznagel the overnight coach, Kenneth Newsome Cap 3 Team Lead

11

> and Eva Mullins overnight Coach. Gelawn is claiming that Phillip was yelling his name from the end of the aisle trying to get his attention in an aggressive tone, the witness statement that I got from Eva is that Phillip asked him multiple times to come to the office to have a conversation about the fact the Gelawn should of been zoning but was watching TicTok. As Phillip approached Gelawn, Gelawn got into Phillips face and stated that he would beat him up. Gelawn in his own statement stated that he did say he would beat him up. In another instance Gelawn states that Phillip made a comment after Gelawn said that his jaw hurt that he needed to zip up his pants. Kenneth was a witness to this conversation and stated that that was not said.

(R. 65 Report.)

Emails indicate that the investigation continued at the Walmart Global Ethics & Compliance department at corporate headquarters, but that the staff was unable to obtain more information because both Spitznagle and Guyn had been terminated and, thus, the case was closed. (R. 66 Emails.).

It is true that the investigation does not seem to have included complaints of racial discrimination, but, as discussed, in his only written complaint, Guyn did not complain of racial discrimination.

Moreover, to the extent that Walmart's investigation could have been more thorough or efficient, that is not the issue in this case. The issue is whether Walmart's investigation provides evidence that Newsome fired Guyn in retaliation for his complaints of racial discrimination. Nothing about how the investigation was handled or its findings indicate that.

Finally, for his pretext argument Guyn argues that Walmart did not obtain testimony from Tyler Newsome (no relation to defendant Newsome), a Walmart employee who was in the office when Newsome terminated Guyn. Guyn argues that this omission could be construed "as evidence that Tyler Newsome would not testify in a manner favorable to any Defendant in this matter" and

12

"makes Walmart's proffered reasons seem pretextual." (R. 69 Response 22.) A juror could not infer from Walmart's failure to obtain testimony from Tyler Newsome that Walmart terminated Guyn for making complaints of racial discrimination. Tyler no longer works for Walmart, and there is no evidence that he knew anything about the reasons for Guyn's termination.

### III. Conclusion

For all these reasons, the Court hereby ORDERS as follows:

1) the motions for summary judgment (R. 60, 61, 62) filed by the defendants are GRANTED; and

2) judgment will be entered in favor of the defendants.

This 10th day of March, 2025.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY